(91 South. 818)

No. 24665.

## VALESI v. MUTUAL LIFE INS. CO. OF NEW YORK.

(Jan. 30, 1922. Rehearing Denied March 27, 1922.)

*(Syllabus by Editorial Staff.)*

1. Insurance ⟨⟩297—Answers to questions in an application as to use of liquor held representations unless fraudulently made.

Under Act No. 52 of 1906, as amended by Act No. 227 of 1916, making statements by the insured representations and not warranties, in the absence of fraud, and a provision in the life insurance policy to the same effect, answers of the insured to questions contained in the application concerning his use of intoxicants were representations, unless they were designedly and fraudulently made and intended to deceive the insurer upon a matter which would have prevented the issuance of the policy if insurer had known the true facts, though, in the absence of the statutory and policy provisions, it would be immaterial whether the false statements were innocently or fraudulently made.

2. Insurance ⟨⟩646(3)—Burden is on insurer to show answers were fraudulent.

The burden is on insurer to show that false answers to questions in the application were fraudulent, since fraud is never presumed.

3. Insurance ⟨⟩665(3)—Evidence held not to show answers with reference to use of intoxicants were fraudulent.

In an action on a life insurance policy, evidence *held* not to sustain the insurer's burden of proof to establish that answers by insured that he took only one or two glasses of wine a day were fraudulently made.

4. Insurance ⟨⟩665(3)—Whether insured had been "intoxicated" is question as to which opinions might differ.

The term 'intoxicated" has no well-settled meaning, though it is defined generally as drunk, under the influence of intoxicating liquors to such extent as to have lost normal control of the faculties, so that evidence merely that insured had at times been under the influence of intoxicants does not establish that his answer he had not been intoxicated during the past five years was fraudulent.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Intoxicated—Intoxication.]

5. Insurance ⟨⟩297—Misrepresentations false but not fraudulent avoid policy only if they contributed to risk.

Misrepresentations by the insured as to his habits with reference to the use of intoxicants, which were false but were not fraudulently made, do not prevent recovery on the policy, being considered as representations, unless the use of such intoxicants contributed in some way to the death of the insured.

6. Insurance ⟨⟩665(6)—Circumstantial evidence establishing suicide must exclude reasonable hypothesis of accident or act of another.

To prevent recovery on life insurance policy on the ground that insured committed suicide, where the evidence as to the cause of death was circumstantial, the circumstances must be such as to exclude every reasonable hypothesis that death was accidental, or resulted from the act of another.

7. Insurance ⟨⟩665(6)—Circumstantial evidence held not to show fall from hotel window was suicidal.

In an action on a life insurance policy where the defense was suicide, evidence that death resulted from a fall from a window of the hotel room occupied by insured, without evidence establishing a motive for suicide but under circumstances indicating an expectation to continue living, *held* not to exclude the hypothesis that the fall was accidental, or that he may have been pushed from the window by another person, so that recovery cannot be denied on the ground of suicide.

Provosty, C. J., and Baker, J., dissenting.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by Mrs. Laura N. Valesi against the Mutual Life Insurance Company of New-

York. Judgment for plaintiff, and defendant appeals. Affirmed.

Denegre, Leovy & Chaffe, of New Orleans, for appellant.

J. G. Holmes, of Yazoo City, Miss., and Charles Rosen, of New Orleans, for appellee.

By the WHOLE COURT.

DAWKINS, J. This is an action upon a policy of insurance covering the life of plaintiff's deceased husband.

The defenses are twofold:

(1) Suicide within the period during which the policy was contestible; and,

(2) Fraudulent misrepresentation of the insured as to the use of intoxicants.

There was judgment for plaintiff, and defendant appeals.

### Opinion.

Defendant issued a policy of insurance on the life of Dino L. Valesi February 1, 1918, and the insured died August 20th of the same year. The policy contained the usual stipulation that there should be no liability in the event of suicide within one year.

Deceased was a subject of the King of Italy, temporarily residing in this country as the representative of a cotton firm in Italy conducted by his father. He was 32 years old, and while subject to active service in the armies of Italy, which was then engaged in the World War, was here on furlough and likely to be called for service at any time.

We shall consider the two defenses in reverse order.

### Misrepresentation as to the Use of Intoxicants.

[1] Act No. 52 of 1906, as amended by Act No. 227 of 1916, provides that "all statements purporting to be made by the insured shall in the absence of fraud be deemed representations and not warranties,"

and, granting that deceased was in the habit of using intoxicants to a greater extent than he indicated when being questioned on the point, the same would have the effect of a warranty and vitiate the policy only if he concealed the true facts in such a manner as to amount to a fraud or in case the misrepresentation contributed directly to the death; otherwise, under the statute, his answers were mere representations. In fact, the express stipulation of the policy so provides. It reads:

"This policy and the application herefor, copy of which is indorsed hereon or attached hereto, constitute the entire contract between the parties hereto. All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no such statement of the insured shall avoid or be used in defense to a claim under this policy unless contained in the written application hereof and a copy of the application is indorsed on or attached to this policy when issued."

Therefore, both under the statute and by the policy, the answers of the insured to the questions contained in the application were representations, and are to be given effect as such, unless designedly and fraudulently untrue, and intended to deceive the insurer upon a matter which, if it had known the true facts, it would not have issued the policy. See Bacon on Life and Accident Ins. (4th Ed.) vol. 1, § 255 et seq., and authorities cited in footnotes. Both the statute, in this case, and the policy, differently from ordinary cases, require that the representation shall not only be false, but fraudulent as well. In the absence of such provisions, it would make no difference as to the effect whether the false representations were innocently or intentionally made. It would be sufficient to vitiate the policy if they materially affected the risk (Id. § 261), or, if known to the insurer, would have deterred it from issuing the policy.

In the application signed by the insured, attached and made part of the policy, certain

questions, with respect to the use of intoxicants, were asked and answered, as follows:

"26. (A) Have you used wines, spirits or malt liquors during the past year?

"Ans. Yes.

"(B) If so, what has been your daily average in the past year?

"Ans. Not daily. Wine occasionally.

"(C) How much have you used in any one day at the most?

"Ans. One or two drinks.

"(D) Have you been intoxicated during the past five years?

"Ans. No.

"(C) Have you ever taken treatment for alcoholic or drug habits?

"Ans. No.

"(F) If a total abstainer, how long have you been so?

"Ans. ——."

[2] It is contended by defendant that these answers were fraudulently false, and the burden is upon it to establish such fact. Bacon on Life & Accident Ins. vol. 1, § 259. Fraud is not presumed, and he who alleges must prove it. R. C. C. 1848.

[3] Defendant produced some five or six witnesses, consisting of a clerk, house detective, porter, and bell boy, at hotels where deceased stopped, and also a chauffeur and police officer, who swore that on several occasions they saw Valesi come into the hotel at different hours, from 12 to 5 or 6 o'clock a. m., under the influence of intoxicants, and some say as much as one to four times a week over a period of several weeks. Some of these say they saw him as many as three, four, or five times in a condition which they term "drunk." The most positive testimony on this score was given by those witnesses who were employed by the Grunewald Hotel, where he first stopped when coming to New Orleans, during the latter part of 1916 and early in 1917. However, since the application was made on February 1, 1918, this proof with regard to what took place prior to February 1, 1917, would only be pertinent to the question of whether or not deceased had been intoxicated within the preceding five years, for all other questions with regard to his use of intoxicants are, by the terms of the inquiry, confined to the year preceding the application.

As against the proof of defendant, plaintiff introduced as witnesses the business associates of Valesi, consisting of the president and other members of the New Orleans Cotton Exchange, the members of a reputable cotton firm, in whose office deceased had his desk, and worked during business hours of the day, and who testified that they had been intimately associated with Valesi constantly, both during the day and at night, and had never seen him under the influence of intoxicants; that some of them had had lunch with him almost every day, and that he occasionally took a bottle of beer or a glass of wine with his meals; that he was always at his desk by 8:30 o'clock each morning, seemed happy and contented, and showed no signs of dissipation the preceding nights, which, in the nature of things, could hardly have been possible, if deceased had indulged in the manner which the testimony of some of the defendant's witnesses would indicate.

Deceased was an Italian, with the impetuous nature characteristic of that nationality, and no doubt gave the impression, to those unfamiliar with his disposition, that he was under the influence of liquor, when, in fact, he was not. Of all the witnesses who testified for defendant, only two said that they had ever seen him when he was unable to take care of himself, and those were the detective, who said he found Valesi on the same floor (fifth) on which his room was located, unable to find it and showed him where it was; and the other, the porter, who said the deceased drove up to the hotel one morning between midnight and day, was unable to get out of the car, and the automobile drove away. The record shows that deceased was in good health, of robust constitution; in fact, athletic. It does not

show that he drank daily contrary to his answer to the second question quoted above; that he did drink wine principally, and, while he might have taken more than one or two drinks a day at times, the excess is not clearly established. If we are to believe defendant's witnesses, he did at times drink more than a literal interpretation of the words "one or two drinks" would indicate; while, on the other hand, if we believe those most intimately associated with deceased, his answers were substantially correct. Therefore the fraudulent purpose to. deceive has not been established with that reasonable certainty necessary to vitiate the policy. The trial judge, who saw and heard the witnesses testify, so concluded, and we are unable to say he was wrong.

[4] With regard to the statement by Valesi that he had not been intoxicated within the five years preceding the application for insurance, what we have said above is equally applicable. The term "intoxicated" has no well-settled meaning, though the dictionaries describe the condition as follows:

Black and Bouvier say "intoxicated" means "drunk," and define "drunkenness" as:

"The condition of a man whose mind is affected by the immediate use of intoxicating drinks."

The Standard Dictionary:

"Intoxicate—Intoxicated; inebriated; drunk, and hence excited to frenzy."

Same authority:

"Drunk—Under the influence of intoxicating liquors to such an extent as to have lost the normal control of one's bodily and mental faculties, and commonly to evince a disposition to violence, quarrelsomeness and bestiality; inebriated, intoxicated; figuratively saturated and stupefied."

We cannot say what degree the defendant intended by the use of the term "intoxicated"; and since the question of whether or not a man is intoxicated depends a great deal upon the opinion of the one who asserts it, or the conclusions dran from appearances, the insurer might have made the matter clearer by the use of the words bearing a more definite meaning. It is entirely possible that the deceased, as well as many other men of integrity and veracity, in good faith, might not have considered him intoxicated under the circumstances disclosed by this record. Then it is well known that insurance companies do not rely entirely on answers of the applicant, but make independent investigations as to the prospect's habits, and, with the showing made by the answers that Valesi did use intoxicants, it is more than likely that information was sought and obtained from other sources before issuing the policy. Therefore, in view of the good faith which the law attributes to every one in the absence of convincing proof of fraud, we conclude that Valesi's answers to the questions propounded in the application for the policy were substantially correct, and that they were, at least, not fraudulent.

[5] Conceding that they were false but not fraudulently so, this would not defeat recovery (being considered as representations) unless the use of intoxicants had contributed in some way to his death; which we find was not the case in this instance.

### Suicide.

The circumstances upon which defendant relies for proof of suicide were as follows:

Valesi came into the hotel between 3 and 4 o'clock in the morning of August 20, 1918. He had his collar open and his coat on his arm. Instead of going to the main entrance, which was open, at that time, he went to the ladies' entrance some distance away on locked, ignored the night watchman's signal to use the main entrance, and insisted upon the door being opened for him, which was finally done with a key obtained from the same side of the building, which was the office. He went to his room, No. 715,

on the seventh floor, had the bell boy bring a pitcher of water and some telegram blanks, put on his pajamas, wrote two telegrams, one in English to St. Louis or Chicago, and the other in Italian to his father's cotton firm in Italy. The one written in English was not offered in the record, but the one in Italian, translated, was as follows:

"Have Washington telegraph renewal of my furlough because I have not yet received."

He then left a call for 7 o'clock a. m.

Just about or a few minutes before 7 o'clock that morning, the head porter for the De Soto Hotel was coming to his work up Baronne street, on which Valesi's room faced, and, with respect to the latter's death, gave the following testimony:

"Q. How did you happen to be coming up Baronne street that morning?

"A. I was on my way to work. I heard some glass break and saw some pieces of paper flying in the air. I looked up.

"Q. What did you see?

"A. Saw some pieces of paper flying from the top of the hotel, and heard some glass break.

"Q. Where did the glass break?

"A. In the street facing the hotel.

"Q. Where were you at that time?

"A. Coming up Baronne street right by the News Boy's Home; where it used to be.

"Q. Now go ahead and tell the court just what you saw.

"A. I saw the body of a man come right to the window, and lays back on the window sill, and turn the legs over, and that is all I watched him until he got to the second floor. I didn't see him hit the banquette.

"Q. You saw the body of a man come to the window?

"A. Yes; and lay back on the window sill, and throw his hands up, and his legs went over his head.

"Q. And he fell out?

"A. Yes.

"Q. After he landed on the pavement, did you go up to him?

"A. Yes, I walked to him.

"Q. Who was he?

"A. Mr. Valesi."

The witness further testified that there was picked up from the sidewalk, near where deceased fell, the picture of a woman, to which we shall refer later. His testimony on cross-examination was, in part, as follows:

"Q. Your attention was attracted first by the falling of this glass on the pavement?

"A. Yes, on the sidewalk.

"Q. And you then glanced up?

"A. Yes.

"Q. And when you glanced up, I understand you to say you saw bits of paper flying through the air?

"A. Yes.

"Q. Did they appear to be falling from this window where the figure of this man was?

"A. I can't say just from what window they were, about the fourth or fifth floor.

"Q. They were about the fourth or fifth floor under the window where this man was; the figure of this man was?

"A. Yes.

"Q. When you first looked up, standing about the middle of the sidewalk, at about the center of the News Boy's Home building, you then saw the figure of this man, didn't you?

"A. Yes.

"Q. Then, how much time expired, as a matter of fact, between the time that the figure crashed on the banquette and the time the body came out the window?

"A. Just a couple of minutes, about quick.

"Q. Then there was no appreciable time?

"A. No, I won't say seconds or minutes. Just that quick. (Witness illustrates by snapping his fingers.)

"Q. You cannot say whether it was a few seconds or a couple of minutes; as a matter of fact, you were not expecting anything of that kind, were you?

"A. Why, no.

"Q. Your first impression, then, that you got as you glanced up at that window, was the body of a man coming out? That is true?

"A. Yes.

"Q. And his hands were thrown up?

"A. Yes, up in the air.

"Q. Over his head?

"A. Yes.

"Q. You then saw him come out with his hands over his head and his feet falling over him?

"A. Yes.

"Q. Did his hands appear to be up in the position (illustrating) as though grasping to catch himself?

"A. His hands were just like that (illustrating with hands as if to catch something), if grabbing for something. (Again illustrating

by witness raising his hands as high as his head.)

"Q. Mr. Rigger, in order that we may get the position of this man's hands in the record, as you testified that position to be, he had his hands in an upright position?

"A. Yes.

"Q. Over his head?

"A. Yes, just about that high. (Holding his hands up.)

"The Court: His fingers about even with the top of his head. Is that right, Mr. Witness?

"A. Yes.

"Mr. Holmes:

"Q. Will you place your hands in that position which the court has designated in the record as placing your fingers about even with the top of your head. Is it not a fact that his hands might have been a little higher?

"A. They may have been a little higher and may have been a little lower.

"Q. You were looking up at the seventh floor of that building?

"A. Yes.

"Q. And you were catching the position of this man at a mere glance, were you not?

"A. Yes.

"Q. At a time when you were not expecting anything of that kind to happen?

"A. Yes.

"Q. And you were, therefore, taking no particular note of this man's position, such as would enable you to determine whether the man was throwing himself out of the window or falling accidentally, were you?

"A. That's right."

The witness also testified that some visiting cards of deceased and a small penknife fell to the sidewalk, and that the body was dressed in blue pajamas.

An examination of Valesi's room, after his death, disclosed that the door was locked from the inside, the bed indicated that it had been slept in, and water for the morning's bath had been drawn, but not used. There was a screen for the window, but this had been raised. The window ledge or sill was 28 inches above the floor; the window was about 5 feet wide; and the width of the window sill from the inside of the room to the outer edge, over which deceased fell, was 24 inches.

As a motive for suicide, defendant attempted to show that the deceased was in financial straits. It proved that he had been sued on some notes given for an automobile, but the evidence showed that the holder had acted rather precipitately, and that Valesi had promptly paid them. It was also shown that he had lost some $5,000 on a future contract, but this had been arranged so that he was paying it off monthly, to the satisfaction of the creditor, and without embarrassment to himself. It also appears that his father was a large dealer in cotton in Italy; that the deceased lived well and spent a great deal of money—so much so that the bell boys and other employés around the hotels where he lived called him the "Count," because of his liberality.

We think, therefore, that the record fails to show financial embarrassment calculated to induce suicide.

The second motive sought to be advanced by defendant was a disagreement between deceased and a woman who had formerly stopped at the same hotel, and with whom he was intimate. This woman had been stopping at the De Soto Hotel when Valesi first went there during the latter part of 1917 or early in 1918, and was said by one witness to have probably been the cause of his going there. He undoubtedly frequented her room, went out with her a good deal, and bought clothing and jewelry for her. Some three months before his death, they had a fuss in the lobby of the hotel, he attempted to choke her, they were separated by employés of the hotel, and he publicly asserted that the clothing she had on had been given her by himself; she pulled off a breast pin and threw it at him; they were both very angry and he spat in her face. However, they made up afterwards, and, according to the same witnesses, were on good terms. This woman was said to be in New York City at the time of Valesi's death,

and had been away from New Orleans about two weeks. It was her picture that fell on the sidewalk and probably preceded him out of the window when he fell to his death.

[6] In the case of Leman v. Manhattan Life Ins. Co., 46 La. Ann. 1189, 15 South. 388, 24 L. R. A. 589, 49 Am. St. Rep. 348, this court said:

"In an action on a life policy, * * * when the defense is self-destruction, the burden of proof is on the insurer to establish suicide, and when circumstantial evidence only is relied on, the defense fails, unless the circumstances exclude with reasonable certainty any hypothesis of death by accident or by the act of another."

In that case the following facts appeared:

"The body found with the wound from a gunshot causing death, the discharged pistol wedged, or as if it has been forced on the thumb of the right hand, the body reclining on the sofa as of one sleeping, the left arm rested on the breast, the right leg crossed on the left, the head in the usual position of one in repose, and there being no evidence of any convulsive movement, if we correctly translate the technical word 'jactitation,' used by the physicians who testify. The pistol was 'tightly wedged' to the thumb so as to require force to remove it. The question is whether these appearances point to suicide to the exclusion of any other cause? Why not, with equal potency, to accidental death or death by the hand of another?"

There had been judgment for defendant below, and it was reversed by this court and the beneficiary allowed to recover.

In Phillips v. Louisiana Equitable Life Insurance Company, 26 La. Ann. 404, 21 Am. Rep. 549, it was said:

"All the facts and circumstances proved, in regard to his death, are that he retired to his room at bedtime, and about 1 o'clock at night the report of a pistol was heard. When the inmates of the house came to the room, the insured was found in a reclining posture on the sofa and a pistol was lying on the floor near by. He had been shot in the mouth. It is possible that he might have shot himself accidentally, or that an enemy might have found him sleeping with his mouth open and shot him in the mouth to avert suspicion. The evidence,

151 LA.—14

being circumstantial only, proves nothing, since it does not exclude all other reasonable hypotheses."

We also quote the following from Boynton v. Equitable Life Ins. Society, 105 La. 202, 29 South. 490, 52 L. R. A. 687:

"Between 7 and 8 o'clock on the morning of March 13, 1894, A. Boynton, after having taken breakfast with his family, consisting of four children—a boy, aged sixteen; a girl, aged eighteen, and two others aged eleven and five, respectively, and to whom he had talked pleasantly during the meal, left the breakfast table, at which his children were still seated, and went into another room of the house. A few minutes after, a report of a gun was heard. The eldest son was the first to enter the room, and was closely followed by his eldest sister. The father was found sitting in a straight, highbacked, armless chair, leaning back. He was not conscious. He was taken from the chair and placed upon the bed in the room in which he was. His daughter removed the shoes from his feet. The son is not certain, but thinks he saw the gun, when he came into the room, lying across his father's leg, with the muzzle turned towards the right, in a direction opposite to that in which he was leaning.

"The gun was a simple single-barrel, 32-inch shotgun. The thumb catch of the hammer was broken. The son had sometime prior tied a string around the hammer, by which it could be cocked. The father and son had been in the habit of shooting rats with it around the house. The son had left it loaded the previous day, but it was not his habit, after using it, to leave it loaded. The gun was a 'trick gun' it seems, and required, as we understand it, some knowledge of its peculiarities to shoot it."

The court also said:

"The defendant introduced testimony to prove that twice on former occasions the insured had sought voluntary death. The first attempt, it was contended, was of a date some months previous to his death. He bought some morphine from a drug store near his home, and said to the owner something about his going to use it to kill himself. On cross-examination, the witness, who is a merchant, and sells medicines, changed and altered this part of his testimony; saying that the deceased said that this would about answer his purpose, or about do the work. The witness added, 'I had no idea, though, that he meant what he said.' On another occasion he went to a boarding house in

Shreveport, and asked for a room to himself for the night, as he wished a quiet night's rest. He was heard groaning during the night, and a physician was called in by the proprietress of the boarding house. The next day she inquired of him how he was. He replied that he was feeling very well, and said, 'Why did you send for a doctor? I wanted to die.' His family troubles were more than he could bear, so he is reported to have said.

"The testimony leads to the inference that his family troubles grew out of the conduct of his two brothers, who were, a few months before his death, charged with larceny, and were forced to leave the state to avoid a criminal prosecution. Upon evidence of which the foregoing is a summary, defendant seeks to have the judgment reversed. * * *

"If we weigh his conduct indicating a desire to live on the one hand, and the acts which defendant alleges were indicative of his desire to end his life on the other, the conclusion, we think, would be in favor of his desire to live."

Elliott on Evidence also states the rule as follows:

" 'No general or definite rule can be stated as to the extent of proof considered sufficient to establish the theory of suicide. It is evident that it must be sufficient to overcome the presumption against the voluntary taking of one's own life. And if the circumstances proved to establish the theory of suicide leave a reasonable hypothesis that death resulted in any other manner, the evidence will be regarded as insufficient. A general rule might be formulated to the effect that the preponderance required of the insurer in order to overcome the proof and presumptions against suicide must be such as to exclude with reasonable certainty any hypothesis of death by accident or by the act of another.

" 'The presumption of law is always against suicide. This presumption is so strong that the courts usually require some evidence of an intention of suicide, as the intent is regarded as the gist of the act. This presumption against suicide is also strong enough to rebut the usual and natural inferences that might arise from the conditions and circumstances ordinarily pointing to suicide. Thus, where the assured was found dead, lying on his back, with a pistol in his right hand, which was lying across his breast, and there was a pistol or gunshot wound in his right temple, this was held insufficient evidence of suicide.' "

See, also, Neasham v. New York Life Ins. Co. (D. C.) 244 Fed. 556; Modern Woodmen v. Kincheloe, 175 Ind. 563, 94 N. E. 228, Ann. Cas. 1913C, 1259; Ætna Life Ins. Co. v. Milward, 118 Ky. 716, 82 S. W. 364, 68 L. R. A. 285, 4 Ann. Cas. 1092; Edwards v. Travelers' Life Ins. Co. (C. C.) 20 Fed. 661.

[7] In the present case, we think the proof fails to show sufficient motive for suicide. Deceased had a wife in Italy, in whose favor he had taken out this policy nearly seven months before. There is no intimation of unpleasantness or unhappiness between them. He regularly sent her money for her support, and liberally. He had been stationed here to buy cotton, at a time when his country was at war and in need of great quantities of that commodity so important for war purposes. His government had, notwithstanding the great need for men in the Italian army, granted him a furlough to buy cotton extending over a period of nearly two years, and this was about to expire. In fact, on the very morning that he died, he had just sent to his father's firm a message seeking to have this furlough extended. We are not impressed that his relations with the woman above referred to were anything more than that of a concubine, or one with whom he had illicit intercourse. On the day preceding his death he had discussed with his business associates matters of mutual interest and appeared to be in the best of spirits; he had at no time appeared despondent, and on the morning of his death, when he came into the hotel and retired, his actions all indicated a purpose to live and preparation for the future. He had left a call for the hour about the time he fell to his death. The night was a very hot one in August, and it was not unusual that guests raised the screens on the windows in such weather when no fan was used, as in his case. He had evidently drawn the water for his morning bath, and, if he decided to destroy himself, it must have been done very suddenly.

It is rather forcefully argued that in view of the breadth of the window ledge, 24 inches, it would have been rather difficult for one to have fallen accidentally over it in the attitude described by the witness who saw him emerge from the window. However, it was not impossible. He might have been sitting in the window and suddenly become dizzy or lost his balance and fallen; or he might have dropped the picture which preceded him to the ground and lost his balance grabbing at it. He was in his pajamas, and there is no explanation of why a penknife and visiting cards should have fallen out of the window, except that they were knocked out or dropped in some sort of scuffle. It is also not impossible that some one could have been in the room and shoved him out of the window, afterwards locking the door and coming out through the transom.

Our conclusion is that suicide has not been proven with that certainty necessary to sustain such a defense.

The judgment appealed from is therefore affirmed.

O'NIELL, J., concurs in the result.

PROVOSTY, C. J., and BAKER, J., dissent.