## WARREN v. NEW YORK LIFE INS. CO.
### No. 368.

District Court, W. D. Louisiana,
Shreveport Division.
March 7, 1941.

M. K. Smith (of Foster, Hall & Smith),
of Shreveport, La., for plaintiff.

James G. Cowles, of Shreveport, La., and Richard B. Montgomery (of Montgomery & Montgomery), of New Orleans, La., for defendant.

PORTERIE, District Judge.

On June 11, 1940, George Barnes, Jr., signed an application to the New York Life Insurance Company for a policy of life insurance in the sum of $2,500 naming his mother, Madie Huckabaa Warren, the plaintiff herein, as beneficiary. In this application, designated as Part One, he specifically stated: "I have not participated as a passenger or otherwise in aviation or aeronautics."

Part I of the application provided: "It is mutually agreed as follows: 1. That the insurance hereby applied for shall not go into force unless and until the policy is delivered to and received by the applicant and the first premium thereon paid in full during his lifetime, and then only if the applicant has not consulted or been treated by any physician or practitioner since his medical examination, and thereupon the policy shall be deemed to have taken effect as of the date specified under 3 above; provided, however, that if the applicant, at the time of making this application pays the soliciting agent in cash the full amount of the first premium for the insurance hereby applied for, and so declares in this application and receives from the soliciting agent a receipt therefor on the form attached as a coupon to this application and corresponding in date and number therewith, *and if the Company, after medical examination and investigation, shall be satisfied that the applicant was, at the time of making this application, insurable and entitled under the Company's rules and standards to the insurance, on the plan and for the amount hereby applied for, at the Company's published premium rate corresponding to the applicant's age, then said insurance shall take effect and be in force under and subject to the provisions of the policy applied for from and after the time this application is made, whether the policy be delivered to and received by the applicant or not.* 2. That the soliciting agent is not authorized to collect any premium for the insurance hereby applied for except the first premium thereon, which in no event shall exceed one annual premium for such insurance, together with the premium for preliminary term insurance, if any, and that a receipt on the form attached as a coupon to this application and corre-

sponding in date and number therewith is the only receipt the soliciting agent is authorized to give for any payment made hereunder before the delivery of the policy. 3. That only the President, a Vice-President, a Secretary or the Treasurer of the Company can make, modify or discharge contracts, or waive any of the Company's rights or requirements; that notice to or knowledge of the soliciting agent or the Medical Examiner is not notice to or knowledge of the Company, and that neither of them is authorized to accept risks or to pass upon insurability. 4. That by receiving and accepting said policy, any additions or amendments hereto which the Company may make and refer to under 9 above entitled 'Additions or Amendments' are hereby ratified." (Italics supplied.)

Barnes paid the sum of $15.18 to J. H. Gill, soliciting agent, and received a receipt for same incorporating an exact copy of the contract quoted above.

In furtherance of this application he appeared the next day before Dr. E. B. Middleton, company medical examiner, for a physical examination. As part of this physical examination he answered certain questions contained in Part Two of the application and signed a statement, part of which read as follows: "On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the Company believing them to be true shall rely and act upon them."

The questions in regard to his participation in aeronautics he answered in the following manner:

A. How many aerial flights have you taken and when last? Answer: "None"

B. How many aerial flights have you taken within the last year? Answer: "None"

C. State whether as passenger or pilot and whether you are a reservist. Answer: "None"

D. Do you contemplate participation in aeronautics? Answer: "No"

Barnes left the doctor's office in Homer, drove immediately to the Municipal Airport in Shreveport, and signed for an amateur course, the purpose of which was to obtain a private pilot's license. He agreed to pay the sum of $325 for the course, of which he

paid $30 and flew on that very day for thirty minutes. Flying lessons followed on the 14th, 20th, 21st, 22nd and 25th of June.

■ The court is thoroughly satisfied, also, from the evidence, oral and documentary, that Barnes flew as a nonpaying passenger at the Municipal Airport with Mr. Stovall, acting as pilot, in the presence of Mr. Mangum, a mutual friend, on May 17, 1940.

The undisputed facts show further that the company subsequently received knowledge that Mr. Barnes had flown and participated in aeronautics before June 11th, that they received statements from several people to that effect; that one of these people, Mr. Campbell, secured that information while talking with Mr. Barnes over the telephone. The company then requested of the Shreveport agency, on July 11th, that the policy which had been forwarded in routine manner to the agency, to be held until the investigation was completed, be returned. A notice to the effect that the policy was suspended was sent to Mr. Gill on the same morning as received, July 16, and the latter gave this to Mr. Barnes on the next day, together with a blank form of aviation certificate. Mr. Gill explained that if the question blank were filled and submitted by Mr. Barnes the policy would then issue with the Permanent Aviation Clause as a rider. The Permanent Aviation Clause would have lessened the burden of the contracting company in that the beneficiary would have received, instead of the face of the policy, only the reserve of the policy at the date of death, if death occurred from operating or riding in any kind of unlicensed aircraft.

Mr. Barnes was requested by Mr. Gill on three different occasions to fill out the aviation blanks. Yet, the notice of suspension of the policy, together with the aviation questionnaire that had to be completed, were found in Mr. Barnes' car after his death. He had kept the papers for ten days.

The policy was never delivered; it was held in the Shreveport office.

Barnes was injured in an automobile accident on July 26, 1940, and died the next day.

When the branch office at Shreveport heard of Barnes' death, it advised the home office at New York and the home office by letter of July 31, 1940, addressed to the next of kin of George Barnes, Jr., declined the policy and enclosed a check of $15.18 in refund of the quarter premium paid by Barnes at the time of his application.

The court is impressed with the fact that the applicant made repeated false representations in his offer to the company for a contract, as the statement of facts shows. A categorically false statement was made when he said he had never taken any aerial flight before the date of his application on June 11, when it is so true that but a short while before, on May 17, he had flown at the Municipal Airport near Shreveport; and again, when he said that he "did not contemplate participation in aeronautics," when in truth he traveled directly from the doctor's office on the 12th of June, after being examined, to the Municipal Airport at Shreveport and took a flight that very day, enrolling as a student for a course in flying. He flew for thirty minutes on that day, the 12th, and again for the same period of time on the 14th, 20th, 21st, 22nd and 25th of June.

The home office, in good faith and relying upon his initial statements, issued a policy in keeping with the applicant's statements. The company learned of his misstatements and upon investigation was so impressed as to their actual falsity that on July 11, 1940, they notified Mr. J. H. Gill, the soliciting agent who always established contact with the applicant, that the policy was suspended pending additional information and that the applicant should fill out a more itemized questionnaire on his aviation activities. Mr. Gill delivered to the applicant the original notice from the home office as to the suspension, also the itemized questionnaire to be filled out by the applicant and a copy of the Permanent Aviation Clause, the latter to become a part of the original policy. These documents are in the record. On the 17th day of July, the applicant was urged by Mr. Gill to fill this new statement, but the young applicant delayed doing so—keeping all the documents, however, from the 17th to the very day of the accident, when they were actually found in the inside front pocket of the automobile, in blank and unsigned.

Plaintiff stresses the fact, as the main ground for recovery, that the applicant, after all, did not die from an airplane accident and, since the company kept his initial payment on the premium, and he had proved to be an insurable risk physically, he should recover.

In answer, we say that the italicized portion of the paragraph setting out the conditions between the parties, previously quoted in full in the statement of facts, controls this case.

Setting the facts as we have found them to be against the contract provisions, how can it be said there was a meeting of minds? There would have been but for the wilful and repeated misrepresentations of the applicant. The company at all times was fair and diligent, and desirous to contract, but the applicant was unfair, untruthful, and neglectful to the end.

"In the absence of any stipulation fixing the time of the commencement of the risk, it will be regarded as beginning with the completion of the Contract." Cooley's Briefs on Insurance, p. 1367.

"In view of the principle that the risk commences on completion of the contract, if the application provides that no liability shall attach until the application has been approved by the home office, the risk will not cover a loss before such approval." Cooley's Briefs on Insurance, p. 1369.

See, also, Eames v. Home Insurance Company, 94 U.S. 621, 24 L.Ed. 298; Potter v. Phenix Insurance Company, C.C., 63 F. 382.

The facts show that Mr. Gill, soliciting agent for the company, was the only person who met the applicant. We consider, Mr. Gill the agent of the company; his acts are those of the company even though the record discloses that he was not complying with what the main office of the company had directed the branch office to do. We are giving no weight in arriving at the conclusion of this case to the fact that the main office of the company had directed the cancellation of the policy; this fact has nothing to do with the case; the controlling fact is that Gill, the agent of the company, turned over the original documents showing a suspension of the policy pending the time that the applicant straightened himself out as to his status as a user of aeroplanes. This was proof to the applicant that the policy was not "acceptable on the plan and for the amount and at the rate of premium applied for." He, of all people, knew well that the original plan for which he had made his application could not exist because of his falsification as to participation in aeronautics. The modified plan, which at law might be called a new contract, was offered him, subject to his

giving the truth about his flying, but he failed to fill the blanks that had been furnished to him. We admit that during all this period the original advance payment on the premium was held by the company and not returned to the applicant. We cannot hold that the young man was insured at the time of his death, even considering this fact, because the original plan as proposed by him was for an applicant who did not participate in aviation. Since he participated in aviation actively, there had to be a new plan. The new plan proposed has been described already. The retention of the money then was an implied agreement, or offer, by the company that should he eventually comply under the plan including the aviation modification, he would be insured during the interim. At no time did the applicant ever indicate or express a desire or willingness to accept the modified plan or the offer to contract. He never answered the questions on the subject; he never signed the modified application—the equivalent of an acceptance; he had full time and opportunity to do so; therefore, there was never a meeting of the minds.

The contention is made by the plaintiff that should the court rule there was no meeting of minds and therefore no contract, and since the company failed to return the money and to declare the policy canceled instead of merely suspended, the applicant, thinking he was insured, sought no insurance with another company and, consequently, in lieu of the enforcement of the contract damages should be awarded. The court is of the opinion that the loss to plaintiff, if any, was by the fault of the plaintiff and not by the fault of the company. On this subject see Stockton v. Firemen's Insurance Co., 33 La.Ann. 577, 39 Am.Rep. 277; Gonsoulin v. Equitable Life Assurance Society, 152 La. 865, 94 So. 424; Foster v. Morrison, La.App., 145 So. 13.

The contention for damages falls because applicant was not deterred from getting any insurance. He was considering the policy that was being held for his ready convenience, and did nothing to avail himself of it. There is no proof in the record but that the policy offered him by the defendant was as dependable financially and as favorable in rates as any he could have sought elsewhere.

Now, for the sake of argument, granting there was a contract, we are of the view that it was rescinded for material

misrepresentations. The risk caused by participation in aeronautics is a serious one. Misrepresentations on such a subject are material, and Act 52 of the Legislature of Louisiana for the year 1906, as amended and re-enacted by Act No. 227 of 1916 (Dart's La.Stats. § 4113) would characterize the material misrepresentations herein not as mere representations but as warranties, because the court does hold the representations of applicant fraudulent. No man's memory could be as shortlived as that of applicant in this case. New York Life v. McCarthy, 5 Cir., 22 F.2d 241; Maryland Casualty Co. v. Eddy, 6 Cir., 239 F. 477; Peoria Life Ins. Co. v. Haenelt, D.C., 46 F.2d 173; Aetna Life Ins. Co.v. Bolding, 5 Cir., 57 F.2d 626.

We admit that the cases above cited refer invariably to false representations as to the physical condition of the applicant; that Barnes had passed the physical examination and as to his physical condition made no false statement; that his false statements were in connection with whether or not he engaged in private flying; that he was killed in an automobile accident and not in an airplane accident; nevertheless, we believe that the contract here must be considered as an indivisible whole; whether or not applicant actually participated in aeronautics was such an essential part of the application that until there was a meeting of minds, upon the *true* facts as to flying, no contract could arise.

We have read carefully the case of Valesi v. Mutual Life Ins. Co., 151 La. 405, 91 So. 818, 821, cited by plaintiff, from which the following quotation is made:

"Therefore, in view of the good faith which the law attributes to every one in the absence of convincing proof of fraud, we conclude that Valesi's answers to the questions propounded in the application for the policy were substantially correct, and that they were, at least, not fraudulent.

"Conceding that they were false but not fraudulently so, this would not defeat recovery (being considered as representations) unless the use of intoxicants had contributed in some way to his death; which we find was not the case in this instance."

Plaintiff contends that unless the death of the applicant in this case had occurred from "participation in aeronautics" there should be recovery. A reading of the Valesi case, containing a fully-detailed and well-rounded opinion, immediately discloses that Valesi had declared that he was not a drunkard; that he did not even drink to excess; that he did drink wine and beer regularly at meals, and engaged in some social drinking. The policy had been issued to him and he died a good while after the completion of the insurance contract, but within two years from the date of the issuance of the policy. The proof in the case was that he reported to the hotel where he lived quite late in the night, perhaps at three or four o'clock in the morning, and that at seven o'clock the same morning he was seen to fall from the window of his room on the seventh floor to the street pavement, from which fall he immediately died. The defendant insurance company sought to show that he had been drunk that night, was still drunk at the time that he fell from the window, and that he had been drunk at other times, and it followed that his representations at the time of applying for his policy had been false. The conclusion reached by Judge Dawkins in that case was that he did not come to his death from being drunk at the time, nor did the preponderance of the evidence support the conclusion, and that his representations at the time of his application for the insurance were *substantially* truthful. It is obvious therefore that the case, on the analysis made of its facts, is not applicable to the instant case. In the instant case the applicant made representations which we must declare to be false, and fraudulently made. These representations prevented the meeting of the minds between the parties and were the real obstacle to the delivery of a contract prior to the automobile accident.

We admit that the local branch office in Shreveport failed to follow the instructions of the home office at New York, dated at New York as early as July 11, to return the policy from Shreveport to New York and to refund the premium that had previously been paid. The applicant never knew of this direction from New York to Shreveport. He did receive notice in writing, however, of the suspension of his policy, because of his own false representations. He had days within which to furnish the information and agree to the proposed modified contract. He remained silent and inactive to the time of his death, and, in our opinion, under the facts and the law of this case, died without having executed any contract of insurance. Had applicant signed the document, answered the ques-

tionnaire, and made delivery to Gill, the company's agent, the ruling in this case would be different.

Plaintiff refers further to the case of Stonsz v. Equitable Life Assurance Society, 324 Pa. 97, 187 A. 403, 405, 107 A.L.R. 178. We have read carefully this case in 107 A. L.R. 178, as well as the full annotations there. Plaintiff makes the following quotation from the case: "The cases previously cited indicate a trend in the courts to construe the conditions liberally, and to treat receipts similar in wording to the one before us as binding during the interim regardless of the ultimate action of the carrier on the application. These decisions are based upon the assumption that if the receipt meant anything, no other result could have been intended by the parties, for unless the insured was to be protected against injury or death during the interim period there would be no advantage to him in paying his premium in advance."

The Stonsz case involved an application as to a tripartite contract: (1) the death benefit, (2) double indemnity benefit, (3) total and permanent disability benefit. The total annual premium was paid in advance for a contract containing the three benefits. Because the applicant was a coal miner, the company issued a policy, dated eight to ten days later than the date of the application, eliminating the double indemnity benefit. The policy was delivered including a refund check for the surplus amount paid by the applicant because of the elimination of the double indemnity benefit. Between the date of the application and the date of the policy, both hands of the applicant were cut as the result of some accident, causing him to be totally and permanently disabled. The court held the company liable on the disability benefit, on the point that there was not a new contract though it were modified, and the contract of insurance should have been dated as of the date of application. We do not think this cited case applicable to the instant one, for many reasons; but in particular because of the fact that the applicant in the Stonsz case was truthful from beginning to end. He did not falsify. And more, differently from the present case, the action was not upon a receipt of an initial premium but was upon a policy issued and delivered.

On the alternative feature of this case, which is that the insurer should be liable for its negligence in retaining the unearned premium and failing to communicate its rejection of the insurance, we are referred by the plaintiff to the case of Harding v. Metropolitan Life Ins. Co., La.App., 188 So. 177, 178. We note in the cited case that there was a particular agreement to the effect that if applicant proved to be an insurable risk physically, and investigation, when made, verified applicant's declarations on all subjects, and (headnote 11) "if policy should not make its appearance within eight weeks, insurer would under certain conditions pay amount due under policy if issued," and, therefore, "applicant was justified, until expiration of eight week period and for 'reasonable time' thereafter, in assuming that he was protected, so that insurer was liable on basis of implied acceptance for applicant's death within about a month after eight-week period had expired, notwithstanding decision to reject was communicated to agent who embezzled the conditional payment and failed to notify applicant of the rejection, since insurer was liable for the agent's neglect." There is total want of similarity as to facts and conditions between the two cases. By a specific limitation of time, the obligation was binding, irrespective of other considerations; no such condition exists here.

In the instant case there was only the delay of four or five days—from the 13th to the 17th of July—in giving notice of suspension of the policy to the applicant. In the Harding case, no notice whatever, either of suspension or cancellation, was given.

Moreover, here, the applicant, after receiving the notice of suspension and being furnished with the simple documents which would have enabled him to rectify his false statements made initially and make acceptance of the modified contract offered, remained silent and inactive, and died with the documents still in his possession, unfilled and unsigned.

There is evidence in the record seeking to show that though at the moment applicant answered the blank for the examining doctor he did not intend to participate in aeronautics, he did go and sign for lessons and did make a first flight later on that very day, and as it was at this particular time that the French army debacle occurred, this serious military situation caused the applicant to so suddenly change his mind. We are able to give but very little weight to this explanation because, though the French debacle was quick and sudden, it was not a matter of a few hours, after all. This theory could not serve as an explanation for

the flight of May 17th, which the applicant failed to remember at all when he made his declarations.

For any and all of the above reasons, the case of plaintiff must be dismissed at her cost. Judgment will be signed accordingly.