Harold B. CASEY and Floyd S. Casey,
Plaintiffs-Appellants,

v.

TRANSAMERICA LIFE INSURANCE
AND ANNUITY COMPANY,
Defendant-Appellee.

No. 73–1789.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1974.

Decided Feb. 12, 1975.

Rehearing Denied April 14, 1975.

Howard De Trude, Jr., John T. Lorenz and Mark W. Gray, Indianapolis, Ind., for plaintiffs-appellants.

Charles M. Wells, Indianapolis, Ind., for defendant-appellee.

Before SWYGERT, Chief Judge, HASTIE *, Senior Circuit Judge, and PELL, Circuit Judge.

HASTIE, Senior Circuit Judge.

The beneficiaries named in a term insurance policy on the life of James Casey

---

\* United States Senior Circuit Judge William H. Hastie of the United States Court of Appeals for the Third Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

brought this suit in the District Court for the Southern District of Indiana against the insurer to recover on the policy after Casey's death. Holding that the policy had never become effective, the district court denied recovery of death benefits. This appeal followed.

■ ■ Casey's home was in Indiana. There he applied for the insurance now in suit, using an application form provided by the insurer, a California corporation. The policy issued from the insurer's home office in California and became effective, if at all, upon its delivery to the insured in Indiana. Without discussion of the matter, the district court and the parties seem to have regarded the question of the validity or initial effectiveness of the policy as a matter governed by Indiana law. We agree.[1] However, we have found no Indiana adjudication of the question presented by this case.

The application, which was signed by Casey and became a part of the policy, contained the following printed provision: "Any policy issued from this application shall not take effect unless . . . the policy is delivered . . . during the lifetime and continued insurability, as stated in this application, of the Proposed Insured . . . .". Thus, the insurer undertook to make "continued insurability, as stated in this application" a condition precedent to the initial effectiveness of the policy upon delivery.

The application included numerous specific questions concerning the applicant's health and a general inquiry about the survival and health of any brothers or sisters. Also, there were inquiries about the applicant's occupation, how much other insurance was in force on his life or pending, whether he was "a military risk", whether he contemplated foreign travel and finally whether "you intend to fly other than as a passenger".

This question about intention to fly other than as a passenger and the applicant's conduct after answering it have created the present controversy. Casey answered "No" to the question as stated. The district court found, justifiably on the evidence, that this answer was truthful. However, the policy was not delivered until more than three months after the application had been submitted. During that interval Casey decided to learn to fly, enrolled as a student pilot and flew as such several times. About a year and a half after the policy was issued he died in a crash of a plane he was piloting.

After this fatal accident, the insurer learned that Casey had flown as a student pilot before the policy had been delivered. It has been stipulated that, had the insurer been informed before the policy delivery that the applicant was flying "other than as a passenger" it would have required him to elect between paying an additional premium of $3.50 per $1,000 of insurance[2] or having aviation coverage excluded from the policy. In these circumstances, the insurer and, agreeing with it, the district court treated the policy as never having become effective.

We begin our analysis by considering what a layman, unschooled in the practices and terminology of the insurance business, can fairly be held to understand from the words, "continued insurability, as stated in this application", as he reads them in a life insurance application form.[3] The words "as stated in this

---

1. See Restatement (Second) of Conflict of Laws § 192.

2. As the safety of air travel has increased the added premiums for full aviation coverage have progressively been lowered. See Vance, Handbook on Law of Insurance, 3d ed. 1951, 625.

3. ". . . [T]he application [for life insurance] was not to be submitted to underwriters; it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts . . . .." L. Hand, Jr., in Gaunt v. John Hancock Mutual Life Ins. Co., 2d Cir., 1947, 160 F.2d 599, 601, citing Restatement of Contracts § 230. Judge Hand then added that, if the insurer's intended meaning of language in its application form was that which it subsequently urged, "certainly it was easy to say so" on the face of the form. Accord, Liberty National Life Ins. Co. v. Hamilton, 6th Cir. 1956, 237 F.2d 235, 240; Ransom v. Penn Mutual Life Ins. Co., 1954, 43 Cal.2d 420, 274

application" indicate that the meaning of "continued insurability" appears on the face of the application. However, that phrase is nowhere defined or explained. Thus, the applicant is left to speculate what truthful information supplied by him in answer to which questions must continue to be correct up to the time his policy is delivered and his premium paid in order for his life to be insured.

We have pointed out the variety of questions asked in the application. Most of them sought particular information about the applicant's health. And the very nature of life insurance should cause a layman to understand that the willingness of an insurer to act favorably upon his application will depend largely upon the indicated state of his health.

But beyond that, reasonable laymen could differ. Suppose the applicant should apply elsewhere for additional insurance while waiting for delivery of his policy. Suppose one of his siblings had sickened or died. Suppose he should change his employment to the hazardous work of a policeman or an electric line repairman. Suppose he should decide to visit the Middle East, or, as in this case, he decides to take flying lessons. Although the application form included questions about occupation, relatives' health, additional insurance, prospective foreign travel and intention to fly an airplane, we think reasonable laymen can differ in their judgment whether a change of circumstances in relation to any of these matters after submission of an application containing truthful answers about them is within the meaning of the phrase "continued insurability, as stated in this policy". The intended

meaning is made all the more doubtful by the fact that accidental death in a crash of a plane piloted by the insured is not an excepted risk in the policy, so that an insured who takes up flying after the policy becomes effective is fully covered. Of course this is a much greater risk than that involved in flying during the normally very short period between application and policy delivery.

 The district court recognized that this is not a fraud case. The meaning of the continued insurability clause which the insurer inserted as a condition precedent to initial coverage was unclear. Having thus created a basis for reasonable misunderstanding which it could have avoided by more precise language, with the result that the prospective insured received and paid for what he could reasonably consider a valid policy, the insurer will not be permitted to impose its construction of ambiguous language after the death of the insured.[4]

We have not overlooked a number of decisions, relied upon by the appellee, in which courts have sustained the refusal of an insurer to reinstate a lapsed life insurance policy on the ground that, in reasonable professional judgment, a change of circumstances, other than a deterioration of health, has made the applicant for reinstatement "uninsurable".[5] However, a typical policy reinstatement clause is explicitly conditioned "upon presentation of evidence of insurability satisfactory to the insurer". Thus, the insured has assented to an arrangement under which the insurer is expressly authorized to make a decisive rational decision whether, in professional judgment, the new evidence satisfies the imprecise

P.2d 633. And see comment in 1958, 33 Notre Dame Lawyer, 656.

4. "Indiana follows the rule that where an insurance policy is ambiguous, it will be construed liberally in favor of the insured . . . and liability under a policy will not be destroyed by an exception unless clear and free from reasonable doubt." Leonard v. Union Carbide Corp., S.D.Ind. 1960, 180 F.Supp. 549, 552. *Accord,* State Security Life Ins. Co. v. Kintner, 1962, 243 Ind. 331, 185 N.E.2d 527. Thus, the reasoning in the cases cited in note

3, *supra,* appears to be entirely congenial to Indiana law.

5. Kirby v. Prudential Ins. Co., 1945, 239 Mo. App. 476, 191 S.W.2d 379; Kallman v. Equitable Life Assoc. Soc., 1936, 248 App.Div. 146, 288 N.Y.S. 1032; *Cf.* New England Mutual Life Ins. Co. of Boston v. Hinkle, 8th Cir. 1957, 248 F.2d 879. *Contra,* Smith v. Bankers National Life Ins. Co., 1936, 130 Neb. 552, 265 N.W. 546; Illinois Bankers Life Assur. Co. v. Payne, Tex.Civ.App.1936, 93 S.W.2d 576.

standard of insurability. But this cannot logically or fairly be analogized to imposing upon a layman who thinks that he is currently insured under a policy delivered and paid for, and upon his beneficiaries after his death, the risk of not being insured at all if he has not understood imprecise language the way a professional insurer might.

The judgment is reversed.

Reversed.

PELL, Circuit Judge (dissenting).

Being of the opinion that the record requires an affirmance of the judgment for the defendant, I respectfully dissent.

As a preliminary matter, it appears to me that it is necessary for a proper perspective of the appeal to amplify the facts. While ordinarily in the case of disputed facts we would look at the facts from the viewpoint most favorable to the party prevailing below, here it is not necessary as there is no real dispute about the facts but merely as to the applicable law.

It is clear in this case that the policy was not to become effective until delivered and that the delivery date was December 24, 1968. The original application for the insurance was executed on September 17, 1968. At that time Casey's insurance age was 40 years being less than six months from the date of his birth, February 28. As an additional instruction on the application it was requested that the policy be dated to say age 40. At the time the policy was delivered, however, Casey's insurance age was 41 which he acknowledged in an Amendment to Application executed on December 24, 1968. He thereby also made it clear that he was aware that the policy was not effective at the date of the original application. It is also clear that a conditional receipt was not issued.

The last stated facts make inapplicable to the present case the line of cases following Judge Learned Hand's opinion in the *Gaunt* case, note 3 of the majority opinion. The niceties of life insurance to

which Judge Hand was referring was the ambiguity inherent in the situation in which a conditional receipt is issued at the time of the original application. This receipt establishes the effective date of the policy as of the date of the receipt provided that in the company's opinion the applicant was insurable on that date at the rate and plan for which he applied. Judge Hand simply held that not one person in a hundred would have supposed that he would be covered not as of the date of completion of the application but only as of the date of approval. It is not necessary to decide here whether *Gaunt* and its progeny represent good law, even though they have been characterized as "a strong minority.[1] The situation we have here is not that involved in *Gaunt*; Casey was clearly aware that his insurance remained *in fieri* even though an application had been executed.

It is true as the majority opinion states that during the course of applying for insurance, Casey answered numerous questions about his health and that of his near relatives; however, this does not present the complete picture. The only application executed on September 17, 1968, contained no questions about the health of the applicant. This application designated as Part I called for certain identifying information such as name, age, address and occupation. It also has the following question, which was not, as the majority opinion seems to suggest, "finally" in application papers but was the next question following that dealing with occupation and near the beginning of Part I:

8. Aviation, Foreign Travel and Military:

a. Do you intend to fly other than as a passenger or have you flown other than as a passenger during the past 2 years . . .

If "Yes", complete Aviation Questionnaire.

b. Do you plan any foreign travel within the next 2 years? If yes, give details under Remarks . .

1. Comment, 33 Notre Dame Lawyer 656 (1958), majority opinion note 3.

c. Are you a military risk as defined in Section C? If yes, complete Section C . . .

It is to be noted that Casey answered each question in the negative but if he had answered any in the affirmative, further explication would have been necessary. In the case of the aviation question a further questionnaire devoted solely to that subject was called for. This in itself would appear to import materiality even to one who read the application "colloquially."[2]

The health questions appeared in Part II of the application papers which was not executed until September 25, 1968, and which was executed in the presence of a medical doctor, presumably in connection with the physical examination of the prospective insured. The health questions thus by their physical and timewise separation from the aviation question should have been no source of confusion.

At the time Casey executed Part I he had no intention to fly other than as a passenger and had not flown otherwise during the past two years.[3] This situation changed rapidly. Three days after his physical examination he took his first flying lesson. The several flights as a student pilot referred to in the majority opinion occurred on September 28 and 30, October 3, 7, 9, 11, 12, and 15, and November 14, all dates, of course, being prior to the delivery of the policy.

If Casey had answered the aviation question truthfully at any time after September 28 (nearly three months before the effective date of the policy) he would not have been issued the policy

which is the subject of this litigation or if a policy had been issued it would have been at an increased premium.

The stipulation of the parties is as follows:

"The general practice among life insurance companies is to either exclude aviation coverage in a policy on the life of a student pilot or charge an extra premium therefor. If defendant had known before the policy on decedent's life was delivered that the decedent was a student pilot, it would not have issued the policy unless either aviation coverage was excluded or an extra annual premium of $3.50 per $1,000.00 was paid. If the policy with such extra premium had been issued, defendant would have stopped charging the extra premium if and when the decedent had completed 400 solo flying hours and submitted a satisfactory aviation declaration. At the time of his death he had completed approximately 180 such hours."

The policy was actually issued at the home office on November 8, 1968, but was not delivered, as previously noted, until December 24, 1968. On that date, and it would seem fair to assume in connection with the delivery, Casey signed two documents each of which was a part of the application papers. The first of these related only to the health questions of Part II and whether there had been any changes. Again, the health issues as far as having any confusion potential were separate and apart from the matters pertaining to Part I. The second document was designated as an Amendment to Application. In this form there was a place to indicate amendments to

2. The aviation questionnaire was a full page form containing eleven questions most of which were multipart. There is no indication that Casey was aware of what this questionnaire contained nor that he had ever seen one. Nevertheless, its extent and scope is indicative of the significance which the insurance company ascribed to the matter of assuming the risk where flying was concerned.

3. The district court did not treat the case as a fraud case. It is nevertheless interesting to note that one of the plaintiffs, a brother of

the decedent, who was a beneficiary and owner of the policy, was interviewed during the course of an investigation in early October 1968. He represented that James C. Casey, the proposed insured, had no interest in non-commercial flying, and that he had never flown as a pilot, student pilot or passenger in a non-commercial plane. This representation came from a brother who was a business partner of James and the application was made in connection with the funding of a buy-sell agreement among the three brothers.

the application papers, the blanks being as follows:

"Answer to Question ____. Section ____ Part ____."

Obviously the original application had been examined in preparing the Amendment form as two of the blanks were filled in as to questions 4 and 11 of Section A of Part I. No change was indicated in question 8 of Section A of Part I, yet Casey knew that he had repeatedly "flown other than as a passenger during the past 2 years."

The majority opinion would seem to find ambiguity in the term "continued insurability." The opinion cites a number of examples which, it is indicated, would cause reasonable laymen to differ in their judgment as to what was necessary to report by way of change of circumstances. I assume that the majority would not negate the necessity if Casey had discovered shortly after his physical examination and before the policy was delivered that he was suffering from terminal lung cancer. I am not persuaded that the change with regard to flying a private plane as a novice pilot is any less material. The company did not so regard it. Irrespective of whether it would have been legally necessary as a condition precedent to have reported that a brother had recently contracted pneumonia, the clear and explicit language, "continued insurability," in light of the emphasis in the application upon non-passenger flying arising out of the necessity when the same existed to execute a separate aviation questionnaire should not have caused any reasonable layman, including Casey, to have any difference of opinion as to the necessity for reporting the change of conditions.

The majority opinion refers to the decisions arising out of the situation of reinstatement following lapse of a policy but appears to find these of unpersuasive precedential value because of a burden upon the former insured to present evidence of insurability. The majority states that these cases are not applicable to a layman who thinks that he is currently insured. That, however, was not Casey's situation who did not receive a conditional receipt and whose policy was not effective until it was delivered.

In connection with the reinstatement cases, the majority cites several cases (note 5). The case of New England Mutual Life Ins. Co. of Boston v. Hinkle is properly cited with a "Cf." reference because it is not a reinstatement case. Because of its survey of the authorities, which does include reinstatement cases apparently on the assumption that there is no real difference of principle involved, with which I agree, it is worthwhile to include an extensive quotation from it:

"This leaves for consideration the condition as to insurability. The trial court took the position that good health and insurability are practically synonymous. In so doing the trial court erred. While there are some authorities to support such position, the weight of authority and the better rule are contrary. *Good Health is an element of insurability, but is only one of many elements to consider upon the issue of insurability.* The authorities on the meaning of insurability are ably discussed in Kirby v. Prudential Insurance Company of America, 239 Mo.App. 476, 191 S.W.2d 379, 384, 162 A.L.R. 660. The court concludes:

'We cannot say that the term insurability is ambiguous and is susceptible of two different interpretations, one of which is "good health." It is not thought that the man on the street would so construe the term. Probably most people know that to be insurable one must have good health; but they also know that good health is not the only factor about which insurance companies are concerned in the issuance of policies. They know that insurability means more than good health.'

In Rosenbloom v. New York Life Ins. Co., D.C.W.D.Mo., 65 F.Supp. 692, Judge Ridge quotes with approval from the Kirby case and states (at page 696):

' * * * From the opinion in the Kirby case, supra, and the authorities therein cited, it is manifest that the term "insurability" is a term of art when used in conjunction with life insurance. "Insurability" as a term of art signifies all those physical and moral factors reasonably taken into consideration by life insurance companies in determining coverage or matters affecting the risk.'

In reversing the Rosenbloom case on other grounds this court said (8 Cir., 163 F.2d 1, at p. 4):

' * * * For the purposes of this opinion, we assume that "insurability" may include elements other than health—such as vocation. * * *'

In Kallman v. Equitable Life Assurance Society, 248 App.Div. 146, 288 N.Y.S. 1032, 1034, the court speaks as follows:

' * * * The distinction between "good health" and "insurability" might be illustrated in the case of a criminal condemned to death. On the eve of his execution he might be found to be in perfect physical condition, but it could not be reasonably contended that his situation did not affect his insurability. There are numerous circumstances which affect insurability. * * *'

In Warren v. New York Life Ins. Co., supra, [128 F.2d 671 (5th Cir. 1942)] the premium had been paid, and the insurability proviso was similar to that in the present case. Applicant had made negative answers to aviation questions. From investigation the insurer learned of applicant's flying, suspended the application, and requested applicant to fill out an aviation form. The applicant died in an automobile accident before this was done. Recovery was denied upon the basis that no insurance was in force. The insurability proviso is not discussed. However, in the District Court opinion, 37 F.Supp. 358, 362, in considering the materiality of false representations as to insurance, the court states, 'The risk caused by participation in aeronautics is a serious one.' In Kirby v. Prudential Insurance Company of America, supra, the court approved the finding of the trial judge against an applicant for reinstatement on the basis that the applicant was engaged in aeronautics and that such activities substantially increased the risk, stating that the trial court could not properly have found otherwise.

We find the reasoning of the cases holding 'insurability' is broader than 'good health' to be sound and convincing. *For the purposes of our present case it is not necessary to determine just how broad the scope of the term 'insurability' is. We are satisfied that an insurer is justified in taking into consideration a hazardous activity, such as flying, in determining insurability."* (Emphasis added.) 248 F.2d at 885.

In *Hinkle,* the claimant had an advantage Casey did not as he held a conditional receipt. I recognize that *Hinkle* is a 1957 case and that changes in attitude have come about in the intervening period concerning private plane flying. No doubt statistics could be marshalled showing the millions of miles of flying done by private planes without fatalities. Leaving aside the fact that when a private plan plummets to the earth the result more likely than not is fatal, and leaving aside that the statistics include the mileage flown by experienced pilots which Casey was not, he not having acquired his pilot's license until August of 1969, the insurance company does not regard private plane flying as suicidal. It does, however, reserve the privilege by way of condition precedent to require a higher premium for a policy issued to a person flying other than a passenger. Indeed, as far as I can determine, the emphasis was only upon the non-passenger or pilot status and Casey could have been a passenger in a private plane piloted by someone else without effect on the issuance of the policy.

I do not read the *contra*-cited cases in note 5 of the majority opinion as holding contrary to the issue presented here for resolution.

The fact that the conditions and provisions applicable to the present situation, having been written by the company, would be in the case of ambiguity construed against the company has, in my opinion, no applicability here nor should it preclude fair treatment of the company.

"Insurance policies are traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option. (Citations omitted.)

"Concededly, the modern practice of requiring the applicant for life insurance to answer questions prepared by the insurer has relaxed this rule to some extent, since information not asked for is presumably deemed immaterial. (Citations omitted.)

"But the reason for the rule still obtains, and with added force, as to changes materially affecting the risk which come to the knowledge of the insured after the application and before delivery of the policy. For even the most unsophisticated person must know that, in answering the questionnaire and submitting it to the insurer, he is furnishing the data on the basis of which the company will decide whether, by issuing a policy, it wishes to insure him. If, while the company deliberates, he discovers facts which make portions of his application no

longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure. If he fails to do so the company may, despite its acceptance of the application, decline to issue a policy, (citations omitted), or if a policy has been issued, it has a valid defense to a suit upon it." (Citations omitted.) Stipcich v. Metropolitan Life Insurance Company, 277 U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895 (1928).

As Chief Judge Swygert of this court has said more recently in Apolskis v. Concord Life Insurance Company, 445 F.2d 31, 35 (7th Cir. 1971):

"The insured's failure to disclose his heart condition cannot be excused on the ground that he believed the problem was a minor one and was not material enough to mention. An insurance applicant has the duty to act in good faith toward his potential insurer in an attempt to make a full and complete disclosure of all relevant information. (Citations omitted.) Furthermore, an insurer is entitled to truthful responses to all questions on an application so that it may correctly evaluate the risk and determine whether the applicant meets its underwriting standards."

In sum, this court has imposed a liability on the defendant which should not have legally existed. The judgment should be affirmed.[4]

4. The appellants also present an issue which it was not necessary for the majority to reach. This issue arises out of the following stipulation:

"Approximately a year after the policy was delivered, said Hunter encountered the decedent having lunch in a restaurant near Cumberland, Indiana. There were two or three men with the decedent at a near-by table and the decedent was engaged in conversation. Hence, Hunter did not get to talk with him long. The decedent said to Hunter: 'Say, I want to ask you something. I am flying now. Am I covered?' Hunter replied that he was covered. If called as a witness Hunter would testify that until said conversation he did not know that the decedent was piloting airplanes."

Hunter who had taken the original application had been an independent insurance bro-

ker who had placed insurance with various companies. He entered a producer's contract with the defendant company in October 1968. Hunter was present and witnessed the December 24, 1968, Amendment to Application which was signed by all three of the Casey brothers.

The appellants contend that there was either estoppel or waiver from the above stipulated fact. I would find neither, irrespective of what the relationship of Hunter was with the defendant company at any time. All that Casey said was that he was "flying now." As the majority points out, if he had taken up flying subsequent to the delivery of the policy he would have been covered. There is no indication that Hunter ever knew that the flying had commenced within days after the original application.