248 F.2d 879
 NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY OF BOSTON, MASSACHUSETTS, Appellant,
v.
Maxine K. HINKLE, Administratrix of the Estate of W. Max Hinkle, Deceased, and Maxine K. Hinkle, Appellees.
 No. 15740.
 United States Court of Appeals Eighth Circuit.
 November 5, 1957.
 Rehearing Denied December 6, 1957.
 
 Phineas M. Henry, Des Moines, Iowa (Ralph A. Church and Luther L. Hill, Jr., Des Moines, Iowa, were with him on the brief), for appellant.
 Leland S. Forrest, Des Moines, Iowa, for appellees.
 Before SANBORN, WOODROUGH, and VAN OOSTERHOUT, Circuit Judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 Defendant insurance company has appealed from a judgment entered against it upon an alleged contract of temporary life insurance. Jurisdiction based upon diversity of citizenship is established.
 
 
 2
 Rodney Bliss, Jr., general agent of the defendant, learned that W. Max Hinkle had made a mortgage upon his home. Hinkle was service and parts manager for the Onthank Company. Bliss, on February 25, 1955, called upon Hinkle at Hinkle's place of employment to sell him insurance. Defendant's decreasing term policy was fully explained to Hinkle. The policy discussed afforded initial insurance coverage of $10,500 with coverage declining at the rate of $500 per year. Hinkle signed a written application for such a policy at standard rates and paid by check the initial quarterly premium. Thereupon, he was given a conditional receipt reading as follows:
 
 
 3
 "Conditional Receipt. Do Not Destroy.
 
 
 4
 "Received Twenty-one and 70/100 Dollars in connection with an Application made this day to the New England Mutual Life Insurance Company, of Boston, Massachusetts, for Insurance of $10,500 on the life of W. Max Hinkle.
 
 
 5
 "Immediate Coverage
 
 
 6
 "The insurance applied for shall be in full force and effect from this date, provided the Proposed Insured is now in good health, notwithstanding any change in the Proposed Insured's health or condition due to disease hereafter acquired or to any subsequent casualty; and provided that satisfactory evidence that the Proposed Insured is now insurable for the amount, plan and rating applied for is received at the Home Office of the Company in Boston; but if the Company determines that the Proposed Insured is not so insurable, said Application shall be declined and the amount paid will be refunded upon return of this receipt. If any check or draft given in payment of this premium is not paid on presentation, this receipt shall be of no effect. This receipt is not valid unless countersigned for the Company by a duly licensed agent.
 
 
 7
 "Philip C. Raye, Secretary.
 
 
 8
 "Countersigned 2-25, 1955.
 
 
 9
 "Rodney Bliss, Jr., General Agent.
 
 
 10
 
 "If you do not hear from the Company within sixty days, notify the Company at Boston, and upon request and return of this receipt, the premium will be refunded."
 
 
 
 11
 The above receipt is upon a regularly printed form of defendant. The name of the proposed insured, the amount of insurance, the premium, and the date were filled in by Bliss. Bliss also wrote in the words "Immediate Coverage" appearing in the receipt. He signed the receipt as general agent and delivered it to Hinkle.
 
 
 12
 It was understood between Bliss and Hinkle that Hinkle was to submit to a medical examination by the company's medical examiner. An appointment for such medical examination was made for February 28, 1955. There is a conflict in evidence whether the medical examination was deferred to February 28 to suit Hinkle's convenience or that of the company's doctor. Hinkle was killed on February 26, 1955, when the plane which he was operating crashed near Des Moines.
 
 
 13
 Plaintiff, Maxine K. Hinkle, widow of insured, brought this action individually, as beneficiary, and as administratrix of Hinkle's estate, alleging that defendant had assumed insurance coverage upon Hinkle because of the words "immediate coverage" written in the receipt by the agent, Bliss; and that, if such is not the situation, there is a conditional liability on the part of the insurer, and that all the conditions had been performed or excused or prevented from occurring by the defendant. The court submitted to the jury only the claim asserted by the plaintiff individually as beneficiary. Mrs. Hinkle was designated as beneficiary in the application and was entitled to recover if at all as beneficiary.
 
 
 14
 Defendant at the close of the evidence made a motion for directed verdict which was overruled. The motion is set out in a footnote.[1] The jury found for the plaintiff and judgment for plaintiff was entered. Defendant filed a timely motion for judgment n. o. v., restating the grounds urged in his motion for directed verdict and adding a new ground as follows:
 
 
 15
 "The defendant also moves the court for judgment in its favor notwithstanding the verdict on the ground that there was no evidence in the record to support a verdict for the plaintiff on the issue of fact submitted to the jury by the court, namely the good health of W. Max Hinkle on February 25, 1955, and that on that issue alone a verdict should have been directed for the defendant."
 
 
 16
 This appeal is based upon defendant's contention that the court erred in overruling its motions for directed verdict and for judgment n. o. v. Defendant contends that it is entitled to judgment for the reasons stated in the motions.
 
 
 17
 It appears to us that the vital question involved in this appeal is the construction to be given to the conditional receipt heretofore set out. The execution and delivery of the application, the payment of the premium, and the issuance of the receipt all occurred in Iowa. We agree with the parties that Iowa law controls.
 
 
 18
 One of the leading cases in the field of temporary life insurance is Reynolds v. Northwestern Mutual Life Ins. Co., 189 Iowa 76, 176 N.W. 207. In that case the Iowa court had occasion to consider a conditional receipt very similar to the one now before us. There, as in our present case, the first premium had been paid. In the Reynolds case the condition was, "provided the said company in its judgment shall be satisfied as to my insurability, on the plan applied for, on the date of such medical examination." Here, the material condition is, "provided that satisfactory evidence that the Proposed Insured is now insurable for the amount, plan and rating applied for is received at the Home Office of the Company in Boston." The Iowa court in Reynolds recognized that preliminary contracts of insurance are valid and enforceable. The court then states that the contract must be construed as a whole, and effect must be given to the condition relating to insurability. The court says (176 N.W. at page 209):
 
 
 19
 "* * * The insurability of the applicant on the date of the medical examination is, by the contract made the test of the company's liability."
 
 
 20
 The court construes the contract as a whole as follows (176 N.W. at page 209):
 
 
 21
 "* * * Unless the application is in the proper exercise of the company's rights, under the law and the contract, rejected, and the insurance refused, the preliminary contract provides protection from the date of the medical examination, and if death results from some cause arising after the date of such examination, the company is liable upon the contract, according to its terms; but if the company, in the proper exercise of its legal rights, under the law and the contract, which it is unnecessary for us to define in this opinion, rejects the application upon the ground that the applicant is not insurable and returns the premium paid, no liability can arise thereunder."
 
 
 22
 In the Reynolds case the applicant died before the completion of the investigation as to his health. The insurer, after applicant's death, rejected the application upon the ground that the applicant was not an insurable risk on the date of the medical examination. The Supreme Court of Iowa determined that the trial court had properly found as a matter of law that the insurer had in good faith rejected the application on the ground that the applicant was not insurable for the policy applied for, stating (176 N.W. at page 210):
 
 
 23
 "* * * The record, we think, leaves no doubt that he was not entitled to insurance and that no liability existed upon the contract. The fact that the company did not, prior to his death, know that deceased had been for several months afflicted with heart trouble, should not be given controlling importance. It goes to the question of his insurability. * * *"
 
 
 24
 That the subject of temporary life insurance pending approval of application or issuance of policy has caused the courts considerable difficulty is demonstrated by an exhaustive note in 2 A.L.R. 2d 943. The wording of the binders or conditional receipts involved in the decided cases varies considerably. The author of the cited annotation, at p. 960, classifies the types of contracts of temporary insurance in general use as follows:
 
 
 25
 "(1) The first type of contract, around which most of the existing conflict centers, usually provides that any insurance shall, by reason of the payment of a premium at the time of the application, be in force from the date of the application (or of the medical examination), provided the application shall be approved and accepted, as applied for, at the home office of the insurance company.
 
 
 26
 "(2) Another type of receipt provides that the insurance shall be effective as of the date of the medical examination, if the company shall be satisfied that on that date the applicant was an insurable risk and that the application was otherwise acceptable under the company's regulations for the amount and plan of the policy applied for. In some instances the date of the application is taken instead of the date of the medical examination.
 
 
 27
 "(3) In a third type of receipt the provision is that the insurance shall be in force as of the date of the application or the medical examination if the company at its home office shall issue the policy on the plan applied for. In some instances delivery of the policy is required.
 
 
 28
 "(4) The fourth type of receipt is represented by the unconditional provision that the insurance shall take effect as of the date of the approval of the application by the insurer."
 
 
 29
 The conditional receipt we are considering would appear to be of the class described in paragraph 2. The variance is that in our present case the effective date of the insurance is made the date of the receipt rather than the date of the medical examination. The annotator, at page 987, cites authorities upholding the validity of a condition of insurability, among them, Reynolds v. Northwestern Mutual Life Ins. Co., supra; Warren v. New York Life Ins. Co., 5 Cir., 128 F.2d 671; Gonsoulin v. Equitable Life Assurance Society, 152 La. 865, 94 So. 424; State ex rel. Equitable Life Assurance Society v. Robertson, Mo., 191 S.W. 989.
 
 
 30
 The application and conditional receipt in Mofrad v. New York Life Ins. Co., 10 Cir., 206 F.2d 491, are of the same general type we are here considering. In that case a directed verdict for the insurer was affirmed upon the basis that the insurance was not in force because the applicant had not met the insurability test. The court upon the issue of construction states (at pages 493, 494):
 
 
 31
 "* * * `A contract of insurance rests upon and is controlled by the same principles of law applicable to any other contract. What the contracting parties intended, mutually agreed to, and their minds met upon, is the measure of their obligations.' * * * And if the intentions of the parties are clear from an examination of the contractual documents, this court will not rewrite the contract. * * *"
 
 
 32
 "The application for the policy provided that the insurance policy should be dated as of the date of the application. `It was within the rights of, and was competent for, the parties to provide in the application under what conditions and at what time the policy should become effective and binding.' Jones v. New York Life Ins. Co., 1927, 69 Utah 172, 253 P. 200, 202. The provisions in the application agreement do not fix the effective date of the insurance contract. They simply impose conditions precedent to the taking effect of the insurance coverage. Shira v. New York Life Ins. Co., 10 Cir., 1937, 90 F.2d 953. When read together they mean that the insurance coverage shall take effect only in the event the conditions precedent specified in the application are fulfilled, and then only as of the date of the application. * * *"
 
 
 33
 As pointed out by Judge Clark in his concurring opinion in Gaunt v. John Hancock Mutual Life Ins. Co., 2 Cir., 160 F.2d 599, 603, the insurability condition is much fairer to the insured than the approval condition. Under the approval condition absolute power remains in the insurer to reject the risk. Under the insurability condition the risk can be rejected only in the event a good faith determination is made of lack of insurability as of the time the temporary insurance was to become effective.
 
 
 34
 The effect of the words "Immediate Coverage" written into the receipt by the agent must be considered. Under the Reynolds case, supra, a receipt such as the one we are considering provides immediate coverage, subject to the provisos setting out the circumstances under which the insurance would not be in effect. Unless the words "Immediate Coverage" were intended to eliminate the conditions agreed upon, the addition of the words does not change the meaning of the contract. We observe that the receipt is labeled "Conditional Receipt" in large letters. The conditions are plainly stated in the receipt. The conditions were not eliminated from the receipt, nor were they expressly waived. The conditions remained a part of the receipt as delivered. We do not believe that it can fairly be said that the addition of the words "Immediate Coverage" was intended to eliminate the conditions. Under such a construction of the contract as a whole, we do not reach the serious question of the authority of the agent, Bliss, to alter the receipt or to agree to immediate unconditional coverage.
 
 
 35
 From our consideration of the authorities heretofore cited, we believe that the Iowa court would not find the conditional receipt before us ambiguous, and would construe it as providing insurance from the date of the receipt, subject to the condition that if the insurer rejects the application in good faith for valid reasons upon the ground that the applicant is not insurable for the amount, rating, and plan applied for, and the premium is returned, no liability will exist even if death occurs before notice of rejection. The check given for the premium was never cashed. It was returned to the beneficiary and later sent to the defendant by plaintiff's attorney. The insurer has tendered its return.
 
 
 36
 Defendant contended in its motions in the trial and contends here that there could be no valid temporary insurance, relying upon language in the Reynolds case, supra, relating to insurability upon the date of the medical examination. In the Reynolds and some of the other cases relied upon by defendant the conditional receipt called for insurability on the date of the medical examination. In our present case the receipt provides that the insurance applied for shall be in effect from this date (obviously meaning the date of the receipt), subject of course to the provisos. There is nothing in Part I of the application inconsistent with the receipt. The application provides that if the premium is paid with the application "the insurance shall take effect as stipulated in the Conditional Receipt." The conditional receipt on the basis of the words it contains can not fairly be construed to add the medical examination as an additional condition precedent. Whether by implication of law such a condition is to be read into such receipt because of section 508.28 of the Code of Iowa 1954, I.C. A. prohibiting the issuance of a policy of life insurance for more than $10,000 until a satisfactory medical examination shall have been passed and approved by the medical examiner or medical board of a life insurance company, raises an unsettled question of Iowa law upon which we deem it unnecessary and, hence, inadvisable to express an opinion.
 
 
 37
 It was contemplated by the parties that the proposed insured submit to medical examination. By mutual agreement such examination was deferred until February 28, 1955. At the time of the application no one anticipated the proposed insured's untimely death. The fact dispute as to who requested the postponement of the medical examination has no bearing upon the result we reach.
 
 
 38
 The conditional receipt we are considering contains two provisos, the first pertaining to good health and the second to insurability. The trial court submitted the issue of the good health of the applicant at the time of the application to the jury, and in effect told the jury that if they found for the plaintiff on this issue, the verdict should be for her. The jury found for the plaintiff.
 
 
 39
 There is serious doubt whether the question of the sufficiency of the evidence to sustain the jury's verdict upon the good health issue is properly before us for review. Since we consider our determination upon the insurability issue, hereinafter discussed, decisive of this case, we shall assume without deciding that there was enough evidence to make the issue of good health, standing alone, one of fact for the jury, and that the jury's finding that the applicant was in good health is binding upon us.
 
 
 40
 This leaves for consideration the condition as to insurability. The trial court took the position that good health and insurability are practically synonymous. In so doing the trial court erred. While there are some authorities to support such position, the weight of authority and the better rule are contrary. Good health is an element of insurability, but is only one of many elements to consider upon the issue of insurability. The authorities on the meaning of insurability are ably discussed in Kirby v. Prudential Insurance Company of America, 239 Mo.App. 476, 191 S.W.2d 379, 384, 162 A.L.R. 660. The court concludes:
 
 
 41
 "We cannot say that the term insurability is ambiguous and is susceptible of two different interpretations, one of which is `good health.' It is not thought that the man on the street would so construe the term. Probably most people know that to be insurable one must have good health; but they also know that good health is not the only factor about which insurance companies are concerned in the issuance of policies. They know that insurability means more than good health."
 
 
 42
 In Rosenbloom v. New York Life Ins. Co., D.C.W.D.Mo., 65 F.Supp. 692, Judge Ridge quotes with approval from the Kirby case and states (at page 696):
 
 
 43
 "* * * From the opinion in the Kirby case, supra, and the authorities therein cited, it is manifest that the term `insurability' is a term of art when used in conjunction with life insurance. `Insurability' as a term of art signifies all those physical and moral factors reasonably taken into consideration by life insurance companies in determining coverage or matters affecting the risk."
 
 
 44
 In reversing the Rosenbloom case on other grounds this court said (8 Cir., 163 F.2d 1, at p. 4):
 
 
 45
 "* * * For the purposes of this opinion, we assume that `insurability' may include elements other than health — such as vocation. * * *"
 
 
 46
 In Kallman v. Equitable Life Assurance Society, 248 App.Div. 146, 288 N.Y.S. 1032, 1034, the court speaks as follows:
 
 
 47
 "* * * The distinction between `good health' and `insurability' might be illustrated in the case of a criminal condemned to death. On the eve of his execution he might be found to be in perfect physical condition, but it could not be reasonably contended that his situation did not affect his insurability. There are numerous circumstances which affect insurability. * * *"
 
 
 48
 In Warren v. New York Life Ins. Co., supra, the premium had been paid, and the insurability proviso was similar to that in the present case. Applicant had made negative answers to aviation questions. From investigation the insurer learned of applicant's flying, suspended the application, and requested applicant to fill out an aviation form. The applicant died in an automobile accident before this was done. Recovery was denied upon the basis that no insurance was in force. The insurability proviso is not discussed. However, in the District Court opinion, 37 F.Supp. 358, 362, in considering the materiality of false representations as to insurance, the court states, "The risk caused by participation in aeronautics is a serious one." In Kirby v. Prudential Insurance Company of America, supra, the court approved the finding of the trial judge against an applicant for reinstatement on the basis that the applicant was engaged in aeronautics and that such activities substantially increased the risk, stating that the trial court could not properly have found otherwise.
 
 
 49
 We find the reasoning of the cases holding "insurability" is broader than "good health" to be sound and convincing. For the purposes of our present case it is not necessary to determine just how broad the scope of the term "insurability" is. We are satisfied that an insurer is justified in taking into consideration a hazardous activity, such as flying, in determining insurability.
 
 
 50
 The undisputed evidence shows that the proposed insured had held a pilot's license since 1946, and that he had owned an interest in a plane continuously since 1951. He flew every Sunday when the weather permitted, and his 1954 license showed he reported 1450 hours of flying time. The evidence likewise establishes that the insurer uniformly declined to accept at standard rates risks of applicants engaged in flying. The company's policy in the case of applicants engaged in aviation was to require the applicant to fill out an aviation questionnaire which, among other things, asked the applicant whether, in the event the policy could not be delivered at standard rates, he desired a policy at standard rates with an aviation exclusion, or full coverage at extra premium. The extra premium for aviation coverage was $3.75 per thousand per year, which would have increased the premium on the policy applied for nearly 50 per cent.
 
 
 51
 The questions on the application pertaining to aviation were answered by applicant in the negative. The application contains a certification that the information appearing on the application is correctly recorded. Hinkle signed the application. Bliss testified that aviation questions were asked and the answers properly recorded. We have serious doubt whether there is any substantial evidence to the contrary. Mrs. Hansen, a fellow employee of applicant, who had testified in the case in chief, was recalled in rebuttal, and testified that she was within a few feet of applicant's desk at the time the application was filled out. She said she didn't pay much attention to the conversation, but that she knew Mr. Hinkle flew frequently and to the best of her recollection she did not hear any mention of aviation.
 
 
 52
 In the briefs of the respective parties, each is seeking to blame the other for the false answers to the aviation questions, and to assert rights based upon such contentions. The trial court in its instructions to the jury said:
 
 
 53
 "Now, ladies and gentlemen of the jury, my viewpoint is such of this case that it is wholly unimportant whether Mrs. Hansen heard part or all, or anything of that sort, because here is a contract that says if he were in good health at the time then there was temporary insurance that would pay his beneficiary the amount of the insurance. If he were not in good health then he is not entitled to recover regardless, because this conditional receipt only refers to an application. It makes no difference what was said in that application in my judgment. * * *"
 
 
 54
 Neither side excepted to the instructions given, or requested instructions on the theories they are now advancing. We do not believe that the question of who was responsible for the false answers as to aviation on the application is of any importance on this appeal. The defendant was not limited to information contained in the application in passing upon the question of insurability. The defendant had before it the information as to aviation before it acted on the application.
 
 
 55
 It is apparent that the application for insurance was for insurance at standard rates. The premium was paid upon the basis of standard rates. No information was disclosed by the applicant to the effect that he was engaged in flying. The evidence conclusively shows that the proposed insured, because of his aviation activities, was not insurable for the amount, plan and rating applied for, and that the defendant made a good faith determination that he was not so insurable. The fact that Hinkle might have been able to obtain insurance at a higher rate is of no help to the plaintiff as such was not the coverage applied for.
 
 
 56
 Defendant in its pleadings asserts that if temporary insurance existed it was conditional, and that the insurance never became effective because the condition as to insurability was not met. This issue is also raised in the motions for a directed verdict and for judgment n. o. v. Plaintiff complains that the defendant did not fully investigate applicant's insurability. Sufficient information of applicant's aviation activities, evidence as to which was introduced at the trial, came to the defendant to warrant it in good faith to determine that the applicant was not an insurable risk for the plan applied for. The applicant died in an airplane crash the day following the application and before the application could have reached the home office. There was no time for investigation prior to the applicant's death. Any delay in the investigation under such circumstances was in no way prejudicial to plaintiff.
 
 
 57
 The defendant was legally entitled to have its motion for directed verdict sustained upon the basis that the insurance was not in effect at the time of the applicant's death, for the reason that the applicant did not, and could not, meet the insurability condition set out in the conditional receipt because of his aviation pursuits.
 
 
 58
 Other issues argued by the parties have been considered, but do not warrant discussion for the reason that what has heretofore been said compels a reversal.
 
 
 59
 The judgment appealed from is reversed, and this case is remanded with directions to enter judgment for defendant.
 
 
 
 Notes:
 
 
 [1]
 "Motion for Directed Verdict
 "Now then at the close of the evidence the defendant moves the court to direct the jury to return a verdict for the defendant on Count IV of the petition on the following grounds:
 "1. The conditional receipt offered in evidence, and alleged to be a contract of insurance is not a contract, but a receipt delivered to evidence the payment of a first premium in connection with an application for life insurance, and the terms upon which the first premium was paid. It was merely a part of a transaction which constituted an application for life insurance. Said application was not completed and was not accepted by the defendant, and there was no meeting of the minds of the parties to form a contract.
 "2. The said conditional receipt was conditioned upon the receipt of satisfactory evidence at the home office in Boston that the proposed insured was insurable for the amount, plan and rating applied for. It appears from the record that no such evidence was sent to the home office of the defendant at Boston or received by it there, and in fact, no such evidence could have been furnished by the proposed insured in view of his aviation record.
 "3. The conditional receipt contemplated and expressly provided in the third clause of the printed matter therein `If the company determines that the proposed insured is not so insurable, said application shall be declined and the amount paid will be refunded upon return of this receipt.' This provision requires and contemplates a determination by the company as to the insurability of the proposed insured for the amount, plan and rating applied for, and, provided that, if the company determines that the proposed insured is not so insurable, the application will be declined; that this provision negatives the construction of the receipt as being in itself a contract for temporary insurance.
 "4. The insertion of the words `immediate coverage' below the amount of insurance applied for in the conditional receipt does not convert the receipt into a contract of temporary insurance in view of the fact that a decreasing term policy was applied for, and the proposed insured was advised that the amount of insurance in the first year was $10,500, and would decrease annually thereafter.
 "5. If said receipt is construed to be a contract of insurance because of the addition of the words `immediate coverage' under the amount of insurance applied for, said contract is not binding on the defendant because the agent, Bliss, had no authority to make, alter or discharge any policies, contracts or agreements on behalf of or in the name of the company, or, to waive any forfeitures, or, except as otherwise agreed to in writing by a duly authorized officer of the company, to incur any obligations or liability for which the company should be responsible.
 "6. If said receipt is construed to be a contract of insurance, it is not a valid contract under the laws of Iowa because the defendant was prohibited by the statutes of Iowa from issuing contracts of insurance in an amount more than $10,000 without a medical examination duly passed and approved by the medical examiner or the medical board of the company. Section 508.28 of the Code of Iowa, 1954, [I.C.A.] requires or contains this language: `The commissioner of insurance shall decline to approve' any form of policy unless insurance is based upon the satisfactory medical examination of applicant by a physician, and no policy or contract shall be issued by any insurance company to any individual `until such examination has been passed and duly approved by the medical examiner or medical board of such company.' And then in a subsequent section there is a provision that non-medical insurance may be issued up to $10,000.
 "7. It appears from the record that there was no medical examination because of failure of the proposed insured to have an examination. Therefore, he failed to furnish an application upon which the defendant, under the law of Iowa, could insure his life for $10,500.
 "8. It appears from the evidence that the proposed insured was informed that a medical examination was necessary in connection with his application for life insurance. His failure to take said medical examination, as shown by the record, was not due to any act or neglect on the part of defendant, and there is no evidence that said medical examination was waived by the defendant.
 "9. It appears from the evidence that because of the proposed insured's aviation record, he was not insurable for the plan and rating applied for under the defendant's underwriting rules and practices. Regardless of whether the answer to Question 17(a) in the application was written by the agent before or after the proposed insured signed the application, if he had answered `yes' to said question he was not insurable for the plan and rating applied for."
 
 
 
 60
 WOODROUGH, Circuit Judge (dissenting).
 
 
 61
 The controversy here grows out of a well known kind of transaction between the insurance company and a so-called "proposed insured" that is soundly helpful to the business of selling life insurance, but has been unhappily considered in such a way as to bring discredit on the companies and grief and suffering on certain unfortunate widows and orphaned children.
 
 
 62
 In the life insurance business it takes a little time for the companies to check on insurability of prospects and sometimes to adjust clerical or other incidental details and that little delay hampers the selling of life insurance on which the existence of the companies is dependent. To meet that condition, the insurance agents are supplied with the printed form such as was used in this case, headed in bold type "Conditional Receipt", the terms of which enable the agents to assure a prospective purchaser of life insurance that he will not be affected by that unavoidable little delay, but that if he is in good health, he will have (in this case) $10,500.00 insurance on his life in full force and effect from the day he delivers the amount of the first premium to the agent. The conditional receipt bears conspicuously the name of the company (in this case, New England Mutual Life Insurance Company) and the signature and counter signature of company officers; to-wit: General Agent and Secretary, and distinguishing between the time after the necessary delay when a proper policy is conditionally to be issued, and the time of the transaction, the General Agent inserts the date of the transaction conspicuously in writing in the blank for that purpose so that the instrument reads, "Insurance applied for shall be in full force and effect from this date provided the proposed insured is now in good health" — (in this case the date of payment, February 25, 1955, was written in with a pen,) "2/25/1955" and the printing included "this day" (twice repeated) "this date" and "now"; all being used in the instrument to stress that the transaction relates to the undertaking of a present obligation by the company and not to the policy of life insurance that is to be issued later, only on certain conditions.
 
 
 63
 Laymen who are solicited in this transaction understand perfectly that when they pay the money and get the receipt, they have the company's obligation to pay if they die before the final closing of their insurance deal. In this case when the "proposed insured" left his home to go to his death the next day, after he made his payment to the agent, he left the "Conditional Receipt" the company gave him where his wife would find it and know he thought of her and believed he had provided for her.
 
 
 64
 The transaction with the company's agent that caused that belief was an entirely fair one and involved no discrimination in favor of the receipt holder and no unfair burden on the company.
 
 
 65
 In the first place if the proposed insured lied when he said he was in good health, there was no liability on the company. The first and only condition precedent to the obligation the company declared in its receipt, namely, that the insurance was immediately effective, was as above stated, that the "proposed insured is now in good health."
 
 
 66
 The other condition in the receipt was a condition subsequent to the company's obligation declared in the receipt to the effect that if, after its date, satisfactory evidence of the proposed insured's insurability was not received at the company's home office in Boston or if the company determined he was not insurable, it would decline his application for a policy.
 
 
 67
 This condition of the receipt is not incompatible or in conflict with the company's obligation for "insurance in full force from this date." The two accord fully with each other. The words of the receipt make it perfectly plain that the company would not ultimately issue an insurance policy unless the company became satisfied of insurability. But that had nothing to do with the willingness of the company to make and fulfill the obligation concerning "insurance in effect from this date" declared in the receipt.
 
 
 68
 When Mr. Hinkle died, the day after the receipt had been delivered to him and his money had been accepted, all of the conditions upon the company's obligation to pay the amount of $10,500.00 specified in the receipt had become satisfied and the company should pay. The situation then was simply that the company had agreed that if Mr. Hinkle died the money would be paid and if he survived, the matter would go forward to the issuance of a policy or denial of it. After his death there was no point or sense in going on with any inquiry about his eligibility for a life insurance policy of any particular kind or about any other detail that might have come up if he had not died and if the transaction had been proceeded with.
 
 
 69
 There is no element of harshness or unfairness to the company or discrimination towards its patrons in the transaction with the receipt. The terms of the receipt protect the company and forestall such a consequence. The receipt specifies that on determining non-liability, the company will refund the payment made to it by the proposed insured, but it does not state in express words what is to be done with the money paid on the happening of death while the "insurance is in full force from this date" before such company determination. Neither does it state what is to be done with the money if the policy issues. Manifestly the death obviated making the determination as to insurability so that the payment in the hands of the company has to be applied in accord with the necessary implication of the transaction in which it was paid and received.
 
 
 70
 The recital of the receipt is that the payment was "in connection with the application for insurance of $10,500.00 on the life of W. Max Hinkle" so that the company's right to apply it on the temporary coverage is complete and exactly as clear as its right to apply it on the first premium of a policy would have been if such policy had issued. So far as applying the payment is concerned, the same words cover both situations.
 
 
 71
 The payment manifestly was amply sufficient to fully compensate the company for the risk it took under its obligation for insurance in full force and effect from "this date". That is practically demonstrated by the fact that insurance for short term is daily and hourly sold throughout the country through vending machines that deliver a policy for $10,000.00 to anybody and everybody who deposits a fifty-cent coin in the slot. The record shows that the insurance herein was to cost $20.70 a quarter or $82.80 per year of 365 days or 22¢ a day.
 
 
 72
 In the transaction herein involved it is true the company stood to absolutely lose that 22¢ a day if Mr. Hinkle lived and his application was declined. In that event it was obligated to refund the entire $20.70. But the part of that refund the company would lose if the company had to make it probably would not equal the cost of the time of the agent soliciting or of an advertising calendar or gadget also risked to obtain a new policy holder who might well be expected to bring in hundreds or even thousands of dollars of premiums.
 
 
 73
 It might be only "petty stuff" to give a short year's insurance for a full years premium, but it is such a serious wrong for a company to make a man believe it has insured him and to take his money therefore, if it does not so intend and I see no reason to ascribe such a thing to the company in this case.
 
 
 74
 I am not convinced that the few Iowa cases cited prohibit sustaining the judgment for the widow in this case. I would affirm the judgment.